UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

In the matter of:

DOUGLAS L. SWENSON, JEREMY
SWENSON, and DAVID SWENSON,

                Petitioners,

      v.

BUSHMAN INVESTMENT
PROPERTIES, LTD., a Utah limited
partnership, HOLMAN DBSI
ARAPAHOE, LLC, a Utah limited
liability company, JOHN M. CLAYTOR,
as co-executor of the Estate of William
M. Claytor, CHARLEY A. SIMMONS,
SHIRLEY A. SIMMONS, LINDA
GRANA, WILLIAM J. MURPHY, and
JOSEPH KLEM AND ANNA KLEM
2003 REVOCABLE TRUST,

                Respondents.

Case No. 10-cv-00175-EJL

**MEMORANDUM DECISION AND
ORDER**

## INTRODUCTION

In January 2012, an arbitrator awarded the respondents in this case approximately

$458,000 in damages plus an additional $2.27 million in "potential prospective" damages

if certain contingencies occur. The respondents move to confirm the arbitration award

(Dkt. 27), and the petitioners move to vacate it. (Dkts. 49, 57). The motions have been

fully briefed and the Court has determined oral argument would not assist the decision-making process. The Court will therefore decide the motions without a hearing. For the reasons explained below, the Court will vacate one ambiguous portion of the award and remand that portion to the arbitrator for clarification. The Court will confirm the award in all other respects.

## BACKGROUND

The respondents are a group of real estate investors. In the fall of 2008, they purchased fractional interests in a piece of vacant land in Arapahoe County, Colorado from a business known as DBSI E-470 East LLC. At the time, DBSI E-470 was a wholly owned and managed subsidiary of DBSI, Inc. DBSI, Inc., in turn, was a real estate investment company based in Boise, Idaho. Petitioner Douglas Swenson is the former president, CEO, and majority owner of DBSI, Inc. His sons, petitioners Jeremy and David Swenson, were employees of a DBSI affiliate called DBSI Realty.

The investors originally sued DBSI E-470 and the Swensons in March 2009 in federal district court in Colorado. The claims against DBSI E-470 were stayed because that entity had filed bankruptcy in November 2008. The Colorado district court concluded it lacked jurisdiction to compel arbitration in Idaho, but ordered the Swensons to commence an action in Idaho seeking to compel arbitration. This action ensued.

In July 2010, this Court ordered the parties to commence binding arbitration. *See* Dkt. 19. The arbitrator conducted an evidentiary hearing from June 27 through July 1, 2011 and issued an interim award in September 2011, finding all three Swensons liable for breach of contract, and finding Douglas Swenson liable for fraud. In December 2011,

the arbitrator issued his final damages award, and then modified that award in January 2012.

## ANALYSIS

Before reaching the merits of the pending motions, the Court must resolve two threshold arguments. First, the investors argue that the Swensons' motions to vacate were not timely filed. Second, the investors argue that the arbitrator's award is not subject to judicial review because the parties expressly waived that right in their arbitration agreement.

The Court easily rejects the first argument – the motions to vacate were timely filed. The Court also rejects the second argument, though this presents a closer question. As explained below, although the parties waived all rights to appeal, they did not waive the right to have this Court conduct a limited judicial review of the arbitration award under the Federal Arbitration Act.

### A. Timeliness of Motion to Vacate

The deadline for moving to vacate an arbitration award is three months after the arbitrator issues the award. 9 U.S.C. § 12. The investors argue that the clock started ticking in September 2011, when the arbitrator issued his interim award – meaning that the three-month period would have expired in December 2011, well before the Swensons filed their February 2012 motions. The Swensons argue that the three-month period did not begin to run until January 2012, when the arbitrator modified his December 2011 final award. The interim award related to liability; the final award dealt with damages.

Ninth Circuit law is clear on this point. An interim award "may be deemed final for *functus officio* purposes if the award states it is final, and if the arbitrator intended the award to be final." *Bosack v. Soward*, 586 F. 3d 1096, 1103 (9th Cir. 2009). Here, the interim award does not state it is final and there is no indication that the arbitrator intended it to be final. Rather, at the conclusion of the hearing, the arbitrator stated that he was keeping the hearing open until "we deal with interim award issues, attorneys' fees, interests, those types of things." *Arbitration Hearing Transcript, Ex. C. to Ostrovsky Dec.,* Dkt. 48-1, at 1336:13-23; *see also id.* at 43:3-7; 1333:19-22. Additionally, there is no evidence that the parties believed the interim award was final. The Swensons' motions to vacate were therefore timely filed.

The investors' citation to various non-binding authorities does not change this conclusion. Relying on these authorities, the investors argue that if arbitration proceedings are bifurcated into liability and damages phases, an interim award adjudicating liability is final. *See Reply,* Dkt. 45, at 7 (citing, among other cases, *Nat'l Mut. Ins. Co. v. First State Ins. Co.*, 213 F. Supp. 2d 10, 16-17 (D. Mass 2002)). But these cases recognized that the arbitrator and the parties must understand that the ruling on liability was a final award. *See, e.g, id.* (citing *Providence Journal Co. v. Providence Newspaper Guild*, 271 F.3d 16 (1st Cir. 2001)); *McGregor Van De Moere, Inc. v. Paychex, Inc.*, 927 F. Supp. 616, 618 (W.D.N.Y. 1996) ("nothing in the record that even remotely suggests that the parties and the panel itself believed that the panel's decision on liability would be anything less than final."). Again, there is no indication in this case that the parties and the arbitrator understood the interim award to be the final award.

**B.    Court Authority to Review the Arbitration Award**

The arbitration award is also subject to limited judicial review under the Federal

Arbitration Act, despite the parties' agreement that the arbitration award would be "final

and binding" and their more specific waiver of appellate rights.  The arbitration clause

reads as follows:

7.18 Arbitration of Disputes.

> 7.18.1 All Claims Subject to Arbitration. Any dispute,
> controversy or other claim arising under, out of or relating to this
> Agreement or any of the transactions, contemplated hereby, or
> any amendment thereof, or the breach or interpretation hereof or
> thereof, shall be determined and settled by binding arbitration in
> Boise, Idaho in accordance with Idaho law, and the rules and
> procedures of the American Arbitration Association. The
> substantially prevailing party shall be entitled to an award of its
> reasonable costs and expenses, including but not limited to
> attorney's fees and costs. *Any award rendered therein shall be
> final and binding on each and all of the parties thereto and their
> personal representatives, and judgment may be entered thereon
> in any court of competent jurisdiction.*

> 7.18.2 Waiver of Legal Rights. By initialing in the space below,
> the parties acknowledge and agree to have any dispute arising out
> of the matters included in this Section 7 decided by neutral
> arbitration as provided under Idaho law and that they are waiving
> any rights that may possess to have the dispute litigated in a court
> or by jury trial. *The parties further acknowledge and agree that
> they are waiving their judicial rights to discovery and appeals
> except to the extent such rights are specifically included in this
> section.* If either part refuses to submit to arbitration after
> execution of this Agreement and initialing below, such party may
> be compelled to arbitrate under the authority of Idaho law. Each
> party's agreement to this section is voluntary. The parties have
> read and understand the foregoing and agree to submit disputes
> arising out of the matters included in this section to neutral
> arbitration.

*Purchase Agreement*, Dkt. 52-4 (emphasis added).

The effect of this clause is not entirely clear.  The Ninth Circuit has not squarely addressed whether a clause such as this eliminates judicial review under § 10(a) of the Federal Arbitration Act.  It has twice indicated – albeit in *dicta* – that parties to an arbitration agreement can waive judicial review of the arbitrator's decision if they clearly state their intent to do so.  In *Kyocera Corp. v. Prudential-Bach Trade Services, Inc.,* 341 F.3d 987, 1000 (9th Cir. 2003) (en banc), an en banc panel of the Ninth Circuit held that parties could not expand federal review of an arbitration award beyond what 9 U.S.C. § 10(a) provides.  But in reaching that decision, the court stated that "the decision to contract for a *narrower* standard of review than the courts generally apply in the absence of a statutory command is a decision that may be less troublesome than the attempt to contract for a *broader* standard of review than that authorized by Congress, although we need not resolve that question here."  *Id.* at 998 n.16.

In an earlier decision, *Aerojet-General Corp. v. American  Arbitration Association*, 478 F.2d 248, 251 (9th Cir. 1973), the Ninth Circuit observed that "[w]hile it has been held that parties to an arbitration can agree to eliminate all court review of the proceedings, the intention to do so must clearly appear."  In that case, the court held that a clause providing that the arbitration was to be "final and binding" did not show clear intent to eliminate judicial review of the arbitrator's decision.  *See also Bown v. Amoco Pipeline Co.*, 254 F.3d 925, 931 (10th Cir. 2001) (citing *Aerojet* for the proposition that parties may eliminate judicial review by contract so long as their intention to do so is clear and unequivocal).

At least two other circuits, by contrast, have rejected the notion that parties can agree to waive all judicial review of arbitration awards. *See Hoeft v. MVL Group,* 343 F.3d 57, 64 (2d Cir. 2003); *Rollins, Inc. v. Black*, 167 Fed. Appx. 789 (11th Cir. Feb. 17, 2006) (unpublished disposition). In *Hoeft v. MVL Group,* 343 F.3d 57, the Second Circuit held that the "the freedom to contract, like any freedom, has its limits." *Id.* at 64. It reasoned that allowing parties to opt out of all judicial review would eviscerate the careful balance Congress had reached between encouraging arbitration and monitoring its basic fairness. *Id.*

Similarly, in *Rollins Inc. v. Black*, 167 Fed. Appx. 798 (11th Cir. Feb. 17, 2006) (unpublished decision), the Eleventh Circuit concluded that "a 'binding, final and non-appealable' arbitral award does not mean that the award cannot be reviewed. It simply means that the parties have agreed to relinquish their right to appeal the merits of their dispute; it does not mean the parties relinquish their right to appeal an award resulting from an arbitrator's abuse of authority, bias or manifest disregard of the law." *Id.* at 799 n.1.

Swensons relies on the Second Circuit's *Hoeft* decision to argue that this Court should review the arbitrator's decision. In view of the Ninth Circuit's dicta in *Kyocera* and *Aerojet*, however, reliance on *Hoeft* is improper. *See Hoeft,* 343 F.3d at 64 (describing *Aerojet* as one of the "far more scarce" decision that appear willing to narrow the scope of review of an arbitration award); *accord Kim-C1, LLC v. Valent Biosciences Corp.,* 756 F. Supp. 2d 1258, 1266 (E.D. Cal. 2010) ("Since *Aerojet* acknowledges that parties may eliminate or restrict court review of arbitration proceedings, the Court does

not believe it can follow *Hoeft*.").  Rather, under *Aerojet* and *Kyocera,* the key question is whether § 7.18 of the parties' agreement (quoted above) is sufficiently clear to show that the parties intended to eliminate all judicial review.

The Court determines that because the parties did not use the word "review" (as opposed to "appeal") or otherwise plainly state that they wished to eliminate judicial review under the Federal Arbitration Act, this Court has the authority to conduct such a review.  This decision is in accord with other decisions that focus on the word "review" (or variations thereof) in determining the parties' intent in this regard.  In *Kim-C1, LLC v. Valent Biosciences Corp.*, 756 F. Supp. 2d 1258, 1266 (E.D. Cal. 2010), for example, the Court held that the parties adequately expressed their intent to eliminate judicial review by agreeing that the arbitrator's rulings were "non-reviewable" in addition to being final and non-appealable.  Additionally, in *Communications Consultant Inc. v. Nextel Communications of the Mid-Atlantic, Inc.*, 146 Fed. Appx. 550, 552-53 (3d Cir. July 15, 2005) (unpublished decision), the Third Circuit enforced a clause stating that "[t]he decision of the arbitrators shall be final and *unreviewable* for error of law or legal reasoning of any kind and may be enforced in any court having jurisdiction of the parties."  *Id.*  (emphasis added).  The *Nextel* Court explained that "[i]n the presence of such language, the only permissible basis upon which a litigant may challenge the panel's award is if the litigant can show that the panel's actions were influenced by 'corruption, fraud, or partiality,' or that the panel failed to provide a hearing to consider each party's views prior to issuing its decision."  *Id.*

Here, the parties did not plainly state that the arbitrator's decision would be completely unreviewable. More specifically, they did not clearly and unequivocally foreclose review of this Court's limited, highly deferential review of the arbitration award in accordance with the Federal Arbitration Act. This Court will therefore consider the merits of the motions to vacate.

## C.     The Legal Standard

The Federal Arbitration Act authorizes district courts to enforce or vacate an arbitration award entered pursuant to a contractual arbitration agreement between parties. 9 U.S.C. §§ 9-11. Judicial review of arbitration awards is limited and highly deferential. *See Sheet Metal Workers Int'l Ass'n v. Arizona Mechanical & Stainless, Inc.*, 863 F.2d 647, 653 (9th Cir.1988). The Act sets out specific grounds a court may vacate an arbitration award, including:

(1)   where the award was procured by corruption, fraud, or undue means;

(2)   where there was evident partiality or corruption in the arbitrators, or either of them;

(3)   where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4)   where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). In addition to these statutory grounds, courts may vacate an arbitration award that is irrational or exhibits a "manifest disregard of the law." *Todd Shipyards*

*Corp. v. Cunard Line, Ltd.*, 943 F.2d 1056, 1060 (9th Cir. 1991).  Manifest disregard of the law is more than error, however.  As noted in *Collins v. D.R. Horton, Inc*., 505 F.3d 874 (9th Cir. 2007), courts "may not reverse an arbitration award even in the face of an erroneous interpretation of the law." *Id.* at 879.  Similarly, erroneous findings of fact are not grounds for vacating an arbitration award. *French v. Merrill Lynch, Pierce, Fenner & Smith*, 784 F.2d 902, 906 (9th Cir. 1986).  Rather, to demonstrate manifest disregard, a moving party must show that the arbitrators "understand and correctly state the law, but proceed to disregard the same." *San Martine Compania De Navegacion, S.A. v. Saguenay Terminals Ltd*., 293 F.2d 796, 801 (9th Cir. 1961); *see also generally U.S. Life Ins. Co. v. Superior Nat'l Ins. Co.*, 591 F.3d 1167, 1173 (9th Cir. 2010) (party seeking vacatur must establish grounds for vacating arbitration award).

### D.  Manifest Disregard of the Law

The great majority of the Swenson's arguments are aimed at showing that the arbitrator manifestly disregarded the law.  All three Swenson defendants argue that the arbitrator manifestly disregarded the law by piercing the corporate veil and holding them personally liable for contractual obligations of DBSI entities.  Douglas Swenson additionally argues that the arbitrator manifestly disregarded governing law by: (1) "excusing" the investors from proving various elements of fraud, (2) "flagrantly" violating his Fifth Amendment rights against self-incrimination; and (3) awarding "potential prospective" damages to the investors.

Before addressing these specific arguments, the Court observes a global problem with the Swensons' motions:  They fail to appreciate the governing standard.  Their key

argument is that the arbitrator manifestly disregarded Idaho law, but in actuality, they typically argue that the arbitrator committed factual or legal errors and effectively ask this Court to reweigh or reinterpret the evidence. The Court will not engage in such an exercise, nor is it permitted to do so. The arbitrator did what he was supposed to do, and although the Swensons are unhappy with the result, they fail to demonstrate any manifest disregard of the law.

### 1. The Corporate Veil

The Court will now turn to the Swensons' specific arguments, beginning with the veil-piercing argument. The real estate investment contracts at issue in the arbitration were between the investors and DBSI E-470. The arbitrator found all three Swensons liable for DBSI E-470's contractual breaches by piercing the corporate veil.

Douglas Swenson argues that the arbitrator "manifestly disregarded" Idaho law by piercing the corporate veil without evidence that he commingled his personal funds with corporate funds. This argument has two flaws. First, the arbitrator found that there *was* commingling. *Interim Award,* at 11. Second, commingling is not required to pierce the corporate veil. The Idaho Supreme Court recently set forth the applicable legal standard as follows:

> "To warrant casting aside the legal fiction of distinct corporate existence . . . it must . . . be shown that there is such a unity of interest and ownership that the individuality of such corporation and such person has ceased; and it must further appear from the facts that the observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice."

*Maron v. Wyreless Sys., Inc.*, 114 P.3d 974, 986 (Idaho 2005) (citation omitted). As this

passage reveals, there is no commingling requirement. Swenson's citation to a Ninth

Circuit case – *Katzir's Floor & Home Design, Inc. v. M-MLS.com,* 394 F.3d 1143 (9th

Cir. 2004) – is unavailing. *Katzir* did not apply Idaho law; it applied California law.

Moreover, the California authority *Katzir* relied upon did not state that commingling is a

prerequisite to piercing the corporate veil and the Ninth Circuit did not so interpret that

authority. *See Tomaselli v. Transamerica Ins. Co.,* 31 Cal. Rptr. 2d 433 (Ct. App. 1994).

Rather, the cited California case explained that courts may consider various factors –

including commingling – in determining whether to pierce the corporate veil. *Id.* Idaho

courts have similarly noted that several factors may be considered when deciding whether

to pierce the corporate veil, but that such factors "are not exclusive because the conditions

under which a corporate entity may be disregarded vary according to the circumstances of

the case." *Hutchison v. Anderson,* 950 P.2d 1275, 1279 (Idaho Ct. App. 1997).

Swenson's commingling argument thus lacks merit.

Douglas Swenson also takes issue with the fact that his sons were not owners of

any DBSI entity. As noted, to pierce the corporate veil, there must be a "unity of interest

and *ownership*" between the individual and the entity. Idaho courts, however, have not

squarely addressed whether an individual must be shareholder to be potentially liable for

corporate debts. Other courts, however, have pierced the corporate veil as to non-

shareholders, even in the face of the same language – "unity of interest *and ownership*."

For example, in *Fontana v. TLD Builders, Inc.*, 840 N.E. 2d 767, 501-02 (Ill. Ct. App.

2005), the court explained that its decision to hold a non-shareholder liable for corporate

debts "is consistent with decisions of courts in other jurisdictions that have considered the

issue and have concluded that equitable ownership in a corporation, demonstrated by control exercised by an individual sought to be held liable for corporate debts, may satisfy the "unity of interest and ownership' element of piercing the corporate veil."[1]

Here, the arbitrator concluded that David and Jeremy Swenson were part of an "insider" group that controlled DBSI entities. *See Interim Award,* Dkt. 52-1, at 10 ("According to the Examiner, all three Respondents were considered 'Insiders.' During this period, the Insiders received direct or indirect cash payments (transfers) of over $75 million.") (internal citation to bankruptcy examiner's report omitted). Given that Idaho courts have not squarely addressed whether non-shareholders may be liable for corporate debts, it cannot be said that the arbitrator "manifestly disregarded" Idaho law in determining that non-shareholders Jeremy and David Swenson could be personally liable

---

[1] *Fontana* string-cited the following cases in support of its holding: *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1051 (2d Cir. 1997) ("New York courts have recognized for veil-piercing purposes the doctrine of equitable ownership, under which an individual who exercises sufficient control over the corporation may be deemed an 'equitable owner', notwithstanding the fact that the individual is not a shareholder of the corporation"); *Lally v. Catskill Airways, Inc.*, 603 N.Y.S. 2d 619, 645 (N.Y. App. Div. 1993) (nonshareholder defendant may be, "in reality," the equitable owner of a corporation where the nonshareholder defendant "exercise[s] considerable authority over [the corporation] . . . to the point of completely disregarding the corporate form and acting as though [its] assets [are] his alone to manage and distribute"); *In re MacDonald*, 114 B.R. 326, 332–33 (D. Mass. 1990) (piercing the corporate veil in bankruptcy case to establish debtor as the equitable owner of corporate stock that ostensibly was owned by debtor's father, and therefore finding stock subject to turnover order); *Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc.*, 447 A.2d 406, 412 (Conn. 1982) ("[S]tock ownership, while important, is not a prerequisite to piercing the corporate veil but is merely one factor to be considered in evaluating the entire situation. . . . Thus, while the usual case does involve a director, officer or shareholder of a corporation, the lack thereof, in an unusual case such as this, would not prevent us from imposing liability upon an individual by piercing the corporate veil if the evidence demonstrated the requisite level of control and otherwise satisfied the instrumentality or other applicable test"); *Establissement Tomis v. Shearson Hayden Stone, Inc.*, 459 F. Supp. 1355, 1366, n.13 (S.D.N.Y.1978) (declining to find that under no set of circumstances could defendant husband be shown to be an alter ego of corporation simply because 100% of the corporation's stock was held in his wife's name instead of his).

for the entity's debts.  "[T]o rise to the level of manifest disregard the governing law alleged to have been ignored by the arbitrators must be well defined, explicit, and clearly applicable."  *Collins*, 505 F.3d at 879.

The Swensons next complain that the arbitrator incorrectly concluded that once the corporate veil was pierced as to Douglas Swenson, he was free to find David and Jeremy individually liable as well.  In fact, it appears that the arbitrator relied on his earlier conclusion that David and Jeremy were part of the "insider" group that controlled DBSI entities.  The arbitrator stated that "[o]nce the corporate shield has been pierced, it no longer provides protection for the other Respondents David and Jeremy Swenson *who were 'insiders.'*  The Arbitrator infers, finds, and concludes, based on the evidence, that they were actively involved with their father in aiding him in operating the Control Group Companies as his own personal business."  *Interim Award,* at 12 (emphasis added).

Granted, this statement is not the most artful.  After all, the arbitrator must conclude that the Swenson sons operated the business as *their own* business (not their fathers').  But, at worst, the arbitrator misapplied Idaho law in this regard.  He did not "manifestly disregard" Idaho law.  Further, as explained above, there are grounds for finding non-shareholders liable for corporate debts based on their asserted control over the company, and the arbitrator laid the foundation for such a holding.

Finally, the Court rejects Douglas Swenson's argument that the arbitrator inverted the burden of proof on the veil-piercing issue.  Here, Swenson points out that when the arbitrator discussed piercing the corporate veil, he "noted that the Swensons offered no evidence that any DBSI Group of Companies, including DBSI E-470 adhered to any

corporate record keeping formalities." *Douglas Swenson Mot. to Vacate Memo.*, Dkt. 50, at 15. Based on this observation by the arbitrator, Swenson strings together two illogical conclusions: (1) that the arbitrator required Swenson to offer such evidence; and (2) that by imposing such a requirement, the arbitrator inverted the burden of proof.

This is not a fair reading of the interim award. The arbitrator initially stated that the investors "had established the elements required to pierce the corporate veil" and then went on to support that conclusion with various facts in a five-page, single-spaced section of the interim award. *See Interim Award,* at 7, 7-12. Just because the arbitrator observed that the DBSI companies had failed to observe corporate formalities within that discussion does not mean that he inverted the burden of proof.[2] There was no such error, much less a manifest disregard of the law.

### 2. Fraud

Douglas Swenson next argues that the arbitrator manifestly disregarded Idaho law by excusing the investors from proving three elements of their fraud claim – falsity, intent, and reliance. *See Douglas Swenson Mot. Memo.,* Dkt. 50, at 3

The elements of fraud are: (1) a statement or a representation of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent that there be reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) justifiable reliance; and (9) resultant injury. *Mannos v. Moss*, 155 P.3d 1166, 1170 (Idaho 2007).

---

[2] Related to this argument, Swenson points out that the arbitrator made a factual error. That is, the arbitrator found that "the DBSI Group of Companies, including DBSI E-470 East LLC" failed to offer basic corporate documents into evidence, such as articles of incorporation, bylaws, and the like into evidence. *See Interim Award,* 11. In fact, the Swensons did present such evidence at the arbitration. But this error is not fatal. The arbitrator set forth numerous other facts supporting his decision to pierce the corporate veil. Further, as already noted, factual errors are not grounds for vacating an arbitration award.

### a. Falsity

Regarding the first element – falsity of the statement made – the arbitrator concluded that "[m]ultiple misrepresentations were made in the Investment Summary and Private Placement memorandum." *Interim Award,* at 13. He identified three "key" misrepresentations:

> (1) The entire property would be debt free, no liens would be placed on the property.
>
> (2) A land manager would place a portion of the investors' money into escrow for accountable reserves for payment of land management fees, insurance and real estate taxes.
>
> (3) Investors would receive quarterly option payments beginning Oct 15, 2008.

*Id.*

Swenson argues that none of these statements relate to an existing fact and therefore cannot form the basis of a proper fraud action.

As a general rule, fraud cannot be based upon future promissory statements, or upon the mere failure to perform a promise or an agreement to do something in the future. *See, e.g., Gillespie v. Mountain Park Estates, L.L.C.*, 132 P.3d 428, 431 (Idaho 2006). The allegedly false misrepresentation must concern past or existing material facts. *Id.* However, Idaho courts recognize two exceptions to this general rule: 1) if the speaker made the promise without any intent to keep it but only to induce action upon the part of the promisee; and 2) if the promise was accompanied by false statements of existing fact which showed the promisor's ability to perform the promise. *Id.*

Here, the arbitrator made factual conclusions that would support application of the first exception – that the "speaker made the promise without any intent to keep it but only to induce action upon the part of the promisee." *Id.* The arbitrator concluded that:

> Respondent Swenson knew of facts, which would make fulfillment of the promises contained in the PPM [private placement memorandum] improbable, if not impossible. He knew he was going to place a lien on the property, as he signed the lien. He knew certain funds would not be escrowed in connection with the accountable reserves because his say was final on all accounting issues and he knew no option payments would be made because of the companies' financial problems.

*Interim Award,* at 18.

Under these circumstances, it cannot be said that the arbitrator "manifestly disregarded" Idaho law in determining that the investors satisfied the "falsity" element of their fraud claim.

Swenson, however, complains that the arbitrator relied upon a "superior knowledge" exception from other jurisdictions to conclude that the investors had satisfied the falsity element of their fraud claim. *See id.* at 17. Under this exception, misrepresentations regarding future events are actionable "'where the misrepresentation of a future occurrence is made by one who purports to have superior knowledge of the matter.'" *Id.* (quoting *Sperry Corp. v. Schaeffer,* 394 N.W. 2d 727, 730 (S.D. 1986). The arbitrator determined that (1) Idaho would recognize this exception; and (2) Swenson had the requisite special knowledge.

The Court rejects Swenson's argument that the arbitrator's reliance upon this exception deprived them of the right to have Idaho law govern the arbitration proceedings.

First, as already explained, Idaho recognizes exceptions to the rule relating statements of future intent. Indeed, the Idaho Supreme Court long ago observed "[a]s in many cases the general rule has almost become the exception." *See, e.g., Sharp v. Idaho Inv. Corp.,* 504 P.2d 386, 395 (Idaho 1972); *see also Cooper v. Wesco Builders, Inc.*, 253 P.2d 226 (Idaho 1953) (discussing exceptions).

Second, the superior-knowledge exception the arbitrator relied upon shares theoretical common ground with Idaho's exception relating to false promises, discussed above. The basic notion is that the speaker is in a position to know something the hearer does not – in this case, the speaker allegedly knew he had no intent of making the promised future event occur.

Third, in *Weitzel v. Jukich*, 251 P.2d 542, 544 (Idaho 1953), the Idaho Supreme Court applied some form of the superior-knowledge exception. (The court did not use these precise terms, but the holding is clear enough and the court cited a superior-knowledge case with approval – *Koch v. Rhodes,* 188 P. 933, 935 (Mont. 1920)). In *Weitzel*, the buyer of a farm sued the seller for, among other things, falsely representing that the land would yield 350 tons of hay per year. The court rejected the argument that such a statement constituted "a prophesy or opinion, or . . . something that may or may not occur at some future time" because the "parties to this transaction did not stand on equal footing, nor did they have equal means of knowing the truth." *Id.* (citing *Koch* 188 P. 933).

Finally, the Court is not persuaded by Swenson's argument that the arbitrator improperly supported the fraud award with speculation regarding Swenson's religious

affiliation.  Most significantly, the two sentences Swenson complains of could be omitted

entirely from the arbitration award without doing it any harm.  In those two sentences, the

arbitrator simply pointed to additional evidence – shared religious affiliation – supporting

his conclusion that some of the claimants trusted Swenson.[3]  The more significant

findings relative to the falsity element of fraud are set forth later.  *See Interim Award,* at

18 (the arbitrator concludes that, among other things, "Swenson knew of facts, which

would make fulfillment of the promises contained in the PPM improbable, if not

impossible.").

### b.  Knowledge & Intent

Swenson's arguments regarding fraudulent intent also fail.  Here, Swenson argues

that there was no direct evidence of his "bad state of mind."  This argument fails to

appreciate that fraudulent intent may be proven by circumstantial evidence.  *See, e.g.,*

*Weatherhead v. Griffin,* 851 P.2d 993 (Idaho Ct. App. 1992).  Lack of direct evidence is

not dispositive.

Swenson also argues that the arbitrator's finding that Swenson intended to defraud

the investors is fatally inconsistent with his later refusal to award punitive damages.  In

the punitive damages phase of the proceedings, the arbitrator sought evidence of

Swenson's "bad state of mind."  This comports generally with Idaho law, which requires

punitive damages awards to be supported by a "bad act" and a "bad state of mind."  *See*

---

[3] The relevant part of the Interim Award states:  "Additionally, he [Douglas Swenson] and Claimants were all members of the same church, the Church of Jesus Christ of Latter Day Saints and arguably held the same religious beliefs.  Claimants testified this common bond and shared religious beliefs caused them to trust and feel comfortable doing business with Mr. Swenson and his companies."  *Interim Award,* at 17 (record citations omitted).

*Myers v. Workmen's Auto. Ins. Co.*, 95 P.3d 977, 985 (Idaho 2004).  The "bad state of mind" has been described variously as malice, oppression, fraud, gross negligence, wantonness, deliberateness, or willfulness.  *See id.* at 983.

Theoretically, upon finding that Swenson intended to defraud the investors, the arbitrator had sufficient proof of Swenson's bad state of mind.  *See, e.g., Seiniger Law Office, P.A. v. N. Pac. Ins. Co.*, 178 P.3d 606, 615 (Idaho 2008) (the "mental state required to support an award of punitive damages is 'an extremely harmful state of mind, whether that be termed malice, oppression, *fraud . . .* '") (citation omitted; emphasis added).  The arbitrator, however, assumed he needed direct evidence of Swenson's "bad state of mind" and, finding no such evidence, he declined to award punitive damages.  *See Final Award,* Dkt. 52-2, at 6.  ("Since the hearing was devoid of any direct evidence of Mr. Swenson's bad state of mind and since the Arbitrator cannot draw an adverse inference concerning Mr. Swenson's 'bad state of mind,' no clear and convincing evidence has been proven entitling Claimants to an award of punitive damages.").

The Court rejects Swenson's argument that arbitrator's decision not to award punitive damages necessarily means that the fraud award should be undone.  As discussed earlier, the fraud award was supported by the arbitrator's factual findings.  Certainly, the arbitrator did not manifestly disregard the law in reaching his finding regarding fraudulent intent.

### c. Reliance

Nor did the arbitrator manifestly disregard the law regarding reliance. Swenson says none of the investors (except Susan Holman) testified that they read or relied upon the investment materials. The investors, however, counter that "the E-470 Investors all testified they relied on this [the representation that the property would be debt-free] and other promises in the investment materials." *Opp.*, Dkt. 61, at 21. Regardless of who is characterizing the hearing correctly,[4] there is other evidence indicating that the investors read and relied upon the private placement memorandum. The purchase agreement each investor signed expressly states that the investor read – and was relying upon – statements made in the private placement memorandum:

> Buyer acknowledges that it has received, read and fully understands the Memorandum and all attachments and exhibits thereto. Buyer acknowledges that it is basing its decision to invest in the Interest on the Memorandum and all exhibits and attachments thereto and Buyer has relied only on the information contained in said materials and has not relied upon any representations made by any other person. Buyer recognizes that an investment in the Interest involves substantial risk and Buyer is fully cognizant of and understands all of the risk factors related to the purchase of the Interest, including, but not limited to, those risks set forth in the section of the Memorandum entitled "Risk Factors."

---

[4] What actually happened at the hearing is a mystery because the relevant portions of the hearing transcript are not before the Court. Swenson cites to particular pages of the hearing transcript, but did not include those pages in the selected portions of the transcript that was provided to the Court. *See Reply,* Dkt. 72, at 10 (referring the Court to the hearing transcript at Exhibit H to the Ostrovsky Dec.); *Hearing Transcript, Ex. H to Ostrovsky Dec.* (select portions of transcript do not include cited pages). Typically, the Court would request a supplement, but in this case, the hearing testimony will not impact the Court's ruling. As explained, there is other evidence regarding the investor's reliance on statements made in the investment materials. Additionally, it is worth repeating that this Court must confirm arbitral awards even when they are attributable to "'erroneous findings of fact or misinterpretations of law.'" *French v. Merrill Lynch, Pierce, Fenner & Smith,* 784 F.2d 902, 906 (9th Cir. 1986) (citation omitted).

*Aug. 2008 Purchase Agreement between DBSI E-470 East LLC and William M. Claytor,*

Dkt. 52-4, ¶ 6.5.1, at 5; *see also Ostrovsky Dec.,* Dkt. 52, ¶ 9 (indicating that each

claimant signed a substantially identical purchase agreement); *see also generally 2*

*Domke on Commercial Arbitration* § 29:9 ("Arbitration proceedings are not constrained

by formal rules of procedure or evidence.").

The arbitrator attributed statements made in the private placement memorandum to

Douglas Swenson. Under these circumstances, the arbitrator did not "excuse" the

claimants from proving reliance.

Swenson also complains that the arbitrator improperly invoked the doctrine of

"partial reliance." *See Interim Award,* at 19-20. Under that doctrine, "the alleged fraud

need not be the sole cause of a party's reliance; rather reliance may be established by

circumstantial evidence showing that the alleged misrepresentation or concealment

substantially influenced that party's choice, even though other influences may have

operated as well." 37 Am. Jur. 2d *Fraud & Deceit* § 477. Swenson complains first, that

Idaho courts have not expressly adopted this doctrine, and second, that the arbitrator

misapplied the doctrine in any event, finding Swenson liable despite a complete lack of

evidence that the investors relied on statements he made. *See Douglas Swenson Motion*

*to Vacate,* Dkt. 50, at 24.

Both components of this argument lack merit. First, by invoking the doctrine of

partial reliance, the arbitrator did not manifestly disregard Idaho law. That Idaho has not

directly addressed this particular doctrine in its limited body of law on reliance does not

mean that it would reject it. More to the point, there is no extant Idaho authority rejecting

the doctrine of partial reliance. Nor do the Swensons cite Idaho authority that says misrepresentations must be the *sole* and *only* cause for the investors' reliance. The arbitrator did not, therefore "manifestly disregard" Idaho law. *See Collins*, 505 F.3d at 879 ("to rise to the level of manifest disregard the governing law alleged to have been ignored by the arbitrators must be well defined, explicit, and clearly applicable.").

Further, Swenson mistakenly concludes that the arbitrator failed to find that the investors relied on Swenson's statements. The arbitrator considered statements made in the private placement memorandum – which he attributed to Douglas Swenson – and then noted: "While it was proven during the hearing that Claimants relied on statements from broker dealers, DBSI wholesalers, or other brokers . . . *the statements attributed to Mr. Swenson do not have to be the sole inducements*." *Interim Award*, at 20 (emphasis added). Thus, the arbitrator considered Swenson's statements in his reliance analysis.

### 1. The Fifth Amendment

Douglas Swenson also argues that the arbitration award must be vacated because the arbitrator "flagrantly" violated his Fifth Amendment rights against self-incrimination. The Swensons invoked their Fifth Amendment rights because of a pending criminal investigation. The arbitrator drew some adverse inferences against them.

The problem with this argument is that it wrongly assumes the arbitrator relied solely on adverse inferences to find Swenson liable for fraud. *See Douglas Swenson Mot. Memo*, Dkt. 50, at 16 ("Without these inferences, the Arbitrator could not have plausibly found Doug Swenson liable for fraud."). Stated differently, Swenson presumes there were evidentiary holes and the arbitrator was forced to rely on adverse inferences to fill

them. But the arbitrator cited other evidence to support his findings and then, in addition, drew adverse inferences against the Swensons.

The Court will not delve into all the evidence – nor is it required or permitted to do so under the limited standard of review explained above. Briefly, however, the Court will give an example that reveals the flaws in Swenson's Fifth-Amendment argument.

One of Swenson's primary complaints is that the arbitrator relied on a bankruptcy examiner's report, which was unfavorable to Swenson. Swenson argues the investors "failed to ask Mr. Swenson any question that would allow the Arbitrator to draw an adverse inference about the accuracy of the Report, . . . ." *Douglas Swenson Mot. to Vacate Memo*., Dkt. 50, at 12. But the arbitrator could accept the accuracy of this report regardless of whether Swenson testified about the report. Arbitrators may rely on hearsay evidence and they obviously can reach their own conclusions as to the accuracy of evidence before them. *See generally* 2 *Domke on Commercial Arbitration* §29:9 ("Because common-law rules of evidence do not apply to arbitration proceedings, hearsay is admissible.") (footnote citation omitted).

In sum, Swenson's Fifth Amendment argument lacks merit and provides no grounds for vacating the arbitration award.

**2.** The Arbitrator's "Potential Prospective" Damages Award

Swenson next contends that the arbitrator manifestly disregarded Idaho law by awarding "potential prospective" damages to the investors. To understand this argument, it is necessary to summarize the parties' damages positions at the arbitration as well as the component parts of the arbitrator's damages award.

At the arbitration, the investors argued that their entire $2.7 million investment in the property had been destroyed because the property – which was supposed to be debt-free – was encumbered with a deed of trust and county tax lien. The Swensons argued that the deed of trust had been partially released, which meant that even if the deed of trust was foreclosed, the investors would retain their interest in the property – thus getting exactly what they bargained for.

The arbitrator concluded that the investors were entitled to roughly $458,000, which represented the amount needed to pay off the tax lien, plus land management costs the investors had incurred. *See Jan. 24, 2012 Decision on Request to Modify Final Award,* Dkt. 52-3, at 3. The arbitrator did not accept the argument that the investors had lost their entire $2.7 million investment. He concluded that the investors would be entitled to a damages award for this larger sum only if they actually lost their property interests due to a foreclosure. So he fashioned a flexible award, which called for a "potential prospective" damages award against Douglas Swenson, which would be triggered if the investors lost their interest in the property due to a foreclosure of the deed of trust or the county tax lien. *See Final Award*, at 5 ("If Claimants' interest in the property is foreclosed as a result of the Deed of Trust or Arapahoe County tax lien,

Claimants shall be entitled to prospective actual damages from Mr. Swenson in the amount of $2,729,186.13.[5]"").

Before addressing Swenson's arguments relating to the alleged deficiencies with the arbitrator's award, the Court first observes arbitrators must have a great deal of flexibility in fashioning remedies if the national policy favoring the settlement of disputes by arbitration is to have any real substance. *See generally Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).

Despite the arbitrator's broad authority in this regard, Swenson insists that the arbitrator's damages award manifestly disregards Idaho law because prospective damages may be awarded only if they are "reasonably certain" to occur and the arbitrator did not conclude that a foreclosure is "reasonably certain" to occur.

This argument misses the mark because it fails to acknowledge a distinction between the arbitrator's contingent damages award and a typical prospective damages award. A typical prospective damages award awards a plaintiff monetary damages *now,* based on future events that are reasonably certain to occur. *See, e.g., Hummer v. Evans*, 923 P.2d 981, 987-88 (Idaho 1996). The arbitrator did not make such an award; that is, the investors cannot seek to collect the $2.27 million "potential prospective" damages award now. Rather, if certain events occur (a foreclosure), then the investors would be entitled to additional damages. So the traditional "reasonable certainty" analysis

---

[5] In a later decision, the arbitrator reduced this amount to roughly $2.27 million. *See Decision on Request to Modify Final Award, Ex. C to Ostrovsky Dec.,* Dkt. 52-3, at 3.

Swenson relies upon does not precisely fit here.

Further, at least one other court has upheld an arbitration award that included contingencies. In *Hetherington & Berner, Inc. v. Melvin Pine & Co.*, 256 F.2d 103, 105, 108 (2d Cir. 1958), the Second Circuit upheld an arbitration award ordering a party to pay commissions on future orders, if such orders were made. In that case, the court observed that "[i]f the courts could not adopt such a common sense view of the practical and equitable determinations of arbitrators regarding future events which are defined as well as the circumstances permit, the value of commercial arbitration would be very limited." *Id.* at 108. And so it is here. The arbitrator offered a practical solution regarding future events. The Court therefore declines to vacate the arbitration award based on Swenson's reasonable-certainty argument.

The Court also rejects Swenson's causation arguments as they relate to a potential foreclosure of the deed of trust or a third party's (DBSI Real Estate Liquidating Trust) failure to pay taxes on the property. Swenson's causation analysis overlooks the fact that property is encumbered with a deed of trust and a tax lien due to Swenson's conduct. Put differently, Swenson is the root cause of the predicament the investors find themselves in. Thus, it cannot be said that the arbitrator manifestly disregarded "causation" principles in determining that if the investors lose their property due to these encumbrances, Swenson caused that loss.

That said, the Court does find ambiguity in the potential prospective damages award in one isolated respect. Although Swenson argues that the investors could trigger the potential prospective damages award simply by deciding not to pay their share of the

tax bill, the decision does not expressly say that. The relevant part of the award begins by

generally providing that the investors would suffer additional damages if they lose their

interest in the property due to a foreclosure:

> If the Claimants' interest in the property is foreclosed as a result of the
> Deed of Trust or Arapahoe County tax lien, Claimants shall be entitled to
> prospective actual damages from Mr. Swenson in the amount of
> $2,729,186.13.

*Final Award*, at 5. In the very next paragraph, the arbitrator clarifies that the investors

will not suffer any potential prospective damages so long as the deed of trust is not

foreclosed *and* the DBSI Real Estate Liquidating Trust pays its share of the tax lien:

> If Mr. Benjamin's opinion is correct [*i.e.*, that the investors would not lose
> their interest in the real property if the deed of trust is foreclosed], and if
> DBSI Real Estate Liquidating Trust pays its share (36.5%) of tax lien,
> Claimants will not suffer any recoverable prospective damages and Mr.
> Swenson will not be liable to Claimants for these prospective damages.

*Id.* By negative implication, the above passage provides that the potential, prospective

damages award is triggered in one of two events: (1) the investors lose their interest in

the property due to a foreclosure of the deed of trust; or (2) the DBSI Real Estate

Liquidating Trust fails to pay its share of the tax lien. Thus, as the Court understands this

passage, the potential prospective damages award is not triggered if the investors fail to

pay their share of the tax lien.[6] Nonetheless, given that the earlier part of the award more

generally states that the investors will suffer potential prospective damages if the tax lien

is foreclosed, the award is ambiguous. "If an award is ambiguous it cannot be enforced

---

[6] The arbitrator may have assumed (1) that Swenson would promptly pay the damages
award; and (2) the investors would use the damages award to pay their share of the tax lien.
These assumptions are not, however, expressly stated in the arbitration award.

and, therefore, it should be remanded to the arbitrator." 2 *Domke on Commercial Arbitration* § 33:6 (citing cases). The Court will therefore vacate this isolated portion of the arbitration award and remand it to the arbitrator for clarification.

## E.     Evident Partiality

David and Jeremy Swenson have not shown that the arbitration award should be vacated due to the arbitrator's "evident impartiality."[7] An arbitrator acts with evident partiality either by nondisclosure or actual bias. *Lagstein v. Certain Underwriters at Lloyd's*, 607 F.3d 634, 645-45 (9th Cir. 2010). In nondisclosure cases, the party seeking vacatur need not demonstrate actual bias. Rather, evident impartiality is shown by undisclosed facts that create a "'reasonable impression of partiality.'" *Fid. Fed. Bank, FSB v. Durga Ma Corp.*, 386 F.3d 1306, 1312 (9th Cir. 2004) (citation omitted) In actual bias cases, the party alleging evident partiality must establish "specific facts which indicate improper motives," and the reviewing court must find actual bias as opposed to an impression of partiality. *Woods v. Saturn Dist. Corp.*, 78 F.3d 424, 427 (9th Cir. 1996).

Here, there is no allegation that the arbitrator failed to disclose information, so the actual bias standard applies. The Swensons argue that two key instances show that the arbitrator was actually biased: First, the arbitrator sobbed when one of the investors testified she had developed shingles because she was so worried about her investment. Second, after one of the investors testified that he was a retired bricklayer, the arbitrator stepped down from the bench to shake his hand.

---

[7] Douglas Swenson does not attack the arbitration award on the grounds that the arbitrator was evidently impartial, though he uses some of the same facts David and Jeremy use here – namely, that the arbitrator openly sobbed during one of the investors' testimony – to argue that the arbitrator imperfectly executed his powers. *See Douglas Swenson Mot. to Vacate Memo.*, Dkt. 50, at 27-30.

Neither of these events shows improper motive, and the Swensons do not cite any case authority where similar acts or displays of emotion supported an evident impartiality finding. Moreover, these facts (the sobbing and the handshaking) must be viewed in context of the entire arbitration. Arbitration proceedings are often far less formal than court proceedings, and that was true in this arbitration. The investors indicate that the arbitrator permitted the witnesses to move freely around the hearing room; he shook hands with many witnesses; and he engaged in conversations with counsel and the witnesses, including joking with one of the Swensons' witnesses. The arbitrator also frequently praised the Swensons' attorneys. More substantively, the investors point out that the arbitrator issued numerous rulings favorable to the Swensons.

As for the display of emotion, the arbitrator broke down sobbing because of a medical issue – shingles – that had nothing to do with the dispute. He also explained that he became emotional not because he favored the investor's testimony, but because the discussion of shingles reminded him of a friend and former law partner who had died. Swenson's counsel did not voice any objection; to the contrary they indicated only that they understood and that there was no need to apologize for the emotional display. The Court cannot find evident partiality on these facts.

**F.      Imperfect Execution of Powers**

Finally, Douglas Swenson raises a variety of different facts to illustrate how "peculiar" the proceedings were, which is part of a larger effort to show that the arbitrator imperfectly executed his powers. Specifically, Swenson points to the following:

(1)     Swenson says that the evidentiary hearing did not "conform to the typical rules of formality" and the arbitrator often chatted with the witnesses during breaks in the hearing and interrupted questioning for "jovial interactions" with the witnesses.

(2)     As already noted, Swenson points out that (a) the arbitrator cried when one of the investors testified that she developed shingles, and (b) at the conclusion of one of the investor's testimony, the arbitrator "literally walked off the bench to shake his hand."

(3)     The arbitrator pierced the corporate veil and found David and Jeremy Swenson liable for breach of contract despite the fact that, at the conclusion of the evidentiary hearing, he indicated that "so far" he had not seen "a wealth of evidence" indicating that David and Jeremy Swenson "knew anything about anything."

(4)     After the arbitrator issued his interim award, he sought out the Swenson's expert at a social function and told the expert about his decision, despite the fact that the interim award was subject to a confidentiality order the arbitrator had entered. Later, the arbitrator informed the parties he had spoken to the expert, but indicated only that he said "hi, nothing more."

None of these facts show the type of arbitral misconduct necessary to vacate the award. Swenson's key complaint relates to the arbitrator's *ex parte* contact with the expert, and the arbitrator's subsequent failure to accurately disclose the substance of his discussions with the expert. Although the arbitrator should not have contacted the expert *ex parte,* Swenson has failed to demonstrate any resulting prejudice. *See Employers Ins. v. Nat'l Union*, 933 F.2d 1481 (9th Cir. 1991) (vacatur inappropriate where party failed to show prejudice from ex parte contacts); *cf. Totem Marine Tug & Barge, Inc. v. N. Am. Towing, Inc.,* 607 F.2d 649, 653 (5th Cir.1979) (award vacated in part because the "ex parte receipt of evidence bearing on this matter constituted ... prejudic[e] to Totem's rights").

Similarly, Swenson's other complaints do not show that the arbitrator exceeded his

powers.  At most, they show that the arbitrator was unusual and that the arbitration was informal.  They also show that the arbitrator may have reached some tentative conclusions regarding David and Jeremy Swenson and then changed his mind.  These are not reasons for vacating an arbitration award.  Further, the Court cannot conclude that the lack of formality or the arbitrator's emotional or "unusual" behavior was symptomatic of some larger, substantive defect.

In sum, the Swensons may not have received the perfect, formal hearing they expected, but they received a fair one.  They had notice, an opportunity to be heard and an opportunity to present relevant and material evidence.  They were entitled to no more. *See Employers Ins.,* 933 F.2d at 1491.

## ORDER

1.    Respondents' Motion to Confirm Arbitration Award (Dkt. 27) is **GRANTED** in part and **DENIED** in part.  All portions of the award are confirmed, with the exception of one isolated portion of the potential prospective damages award.  As discussed above, it is unclear whether the arbitrator intended potential prospective damages to be triggered if the tax lien is foreclosed based on the investors' failure to pay their share of the tax lien.  This discrete portion of the award is ambiguous and is vacated and remanded to the arbitrator for clarification.  The award is confirmed in all other respects.

2.    Petitioner Douglas L. Swenson's Motion to Vacate Arbitration Award (Dkt. 50) is **GRANTED** in part, and **DENIED,** in part as explained in the preceding paragraph.

3.   Petitioners Jeremy and David Swenson's Motion to Vacate Arbitration Award (Dkt. 57) is **DENIED.**

4.   Respondents' Motion for Leave to File Motion to Strike (Dkt. 47) is **MOOT.**


DATED:  April 27, 2012

~~Honorable~~ Edward J. Lodge
**U. S. District Judge**